# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 0005 | **DATE** | March 19, 2002 |
| **CASE TITLE** | *Kevin T., W.T., and K.T v. Elmhurst Community School Dist. No. 205 and The Illinois Board of Education* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, this Court GRANTS Plaintiffs Kevin T., W.T. and K.T.'s Motion for Summary Judgment [22-1] and DENIES Defendant Elmhurst Community School District No. 205's Motion for Summary Judgment [31-1]. Therefore, this Court reverses the decision of the Independent Hearing Officer and an orders that the District: (1) provide Kevin with a free education until he turns twenty-one and one additional year of compensatory education; and (2) reimburse Kevin's parents for expenses incurred at Acacia after the District stopped its funding of Kevin's education before this Court's entered its stay put order. The Court, having disposed of the litigants' claims, directs the clerk of the court to enter a Rule 58 judgment and to terminate this case from the court's docket. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

MAR 20 2002
date docketed

docketing deputy initials

date mailed notice

Document Number

32

RTS  courtroom deputy's initials

U.S. DISTRICT COURT

02 MAR 19 AM 3:34

FILED-01

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **KEVIN T., W.T., AND K.T.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Hon. Blanche M. Manning** |
| v. | ) | |
| | ) | **01 C 0005** |
| **ELMHURST COMMUNITY SCHOOL DIST.** | ) | |
| **NO. 205; and THE ILLINOIS STATE** | ) | |
| **BOARD OF EDUCATION** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

Plaintiffs Kevin T., W.T. and K.T., in their own capacity and as parents of Kevin, filed

this action, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §

1401, et seq., appealing the decision of an Independent Hearing Officer ("IHO") affirming the

decision of Defendant Elmhurst Community School District No. 205 ("the District") to

unilaterally graduate Kevin from highschool against the wishes of Kevin and his parents.[1] The

present matter comes before this Court on the parties' cross motions for summary judgment. For

the reasons that follow, Plaintiffs' motion is GRANTED and the District's motion is DENIED.

DOCKETED

MAR 2 0 2002

---

[1]     On June 7, 2001, the Illinois State Board of Education was dismissed from this
action by agreement.

# BACKGROUND[2]

## I.    Educational History

It is undisputed that Kevin is a person with a disability under the IDEA.  At the time this action was filed, Kevin was a nineteen-year-old man who suffered from multiple disabilities – a learning disability, an attention deficit hyperactivity disorder, and a bi-polar disorder.  To deal with these maladies, Kevin takes various psychotropic medications which in turn make him tired and impair his ability to concentrate and function at school.

Since age six, the District has provided special education services to Kevin at a number of different schools.  From the second semester of eighth grade until the end of eleventh grade, the District placed Kevin at Glen Oaks, a private therapeutic day school in DuPage County that specializes in educating children with severe learning disabilities and behavior disorders.  While at Glen Oaks, Kevin took some non-academic courses at York High School ("York"), a public high school located in the District.

As he entered the twelfth grade, Kevin enrolled full-time at York for the 1998-99 school year.  Unfortunately, Kevin did not make very much academic progress at York.  He received D's in his first semester academic classes and F's in the second semester.  The following school year (1999-2000), at the urging of his parents, the District transferred Kevin to Acacia Academy

---

[2]    The facts set forth in the Background section are taken from the Administrative Record ("AR") from the proceedings before the IHO.  The parties have submitted Local Rule 56.1 statements of material facts.  These statements, however, are not applicable here because those statements are intended to assist the Court in determining whether material questions of fact exist.  See Bd. of Educ. of Oak Park & River Forest High Sch. Dist. No. 200 v. Illinois State Bd. of Educ., 21 F. Supp. 862, 868 n.2 (N.D. Ill. 1998), vacated on other grounds, 207 F.3d 931 (7th Cir. 1999).  Here, however, because the parties have not requested the Court to hear additional evidence, the Court is required to base its factual conclusions on the AR.  See 20 U.S.C. 1415(i)(2)(B); Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir.1997).

("Acacia"), a therapeutic day school that specializes in educating students with severe learning disabilities.

Upon entering Acacia, Kevin tested at the following levels: (1) reading between the third and fourth grade level; (2) math between the fourth and fifth grade level; and (3) writing skills between the third and fourth grade level. After a successful and productive 1999-2000 school year at Acacia, Kevin's academic skills were measured in June 2000 as follows: (1) reading between the sixth and seventh grade level; (2) math between the seventh and eighth grade level; and (3) writing skills between the sixth and seventh grade level.

Despite Kevin's improved performance at Acacia and his lack of academic achievement prior to that time, the District decided to unilaterally graduate Kevin from high school at the end of the 2000 school year against the wishes of Kevin and his parents. The District contends that Kevin should be graduated because he has completed enough credits to graduate from high school. Kevin and his parents, however, assert that Kevin should stay at Acacia at least until he turns twenty-one. As a result of this disagreement, Kevin and his parents requested a due process hearing before an IHO.

## II.     Procedural History

The IDEA mandates that school districts "establish and maintain procedures in accordance with [the IDEA] to assure that children with disabilities and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies." 20 U.S.C. § 1415(a). The IDEA's procedural safeguards guarantee that parents are entitled to an "impartial due process hearing" before a local educational agency if they object to the decisions of the local school regarding the education of

their disabled child. 20 U.S.C. § 1415(b)(2). The parents then may appeal the decision of the local school to a state educational agency, and then bring a civil action in state or federal court. 20 U.S.C. § 1415(c), (e)(2).

Here, in May of 2000, Kevin and his parents requested an administrative due process hearing to challenge the District's decision to graduate Kevin. The IHO issued an interim order, pursuant to the "stay put provision" of the IDEA, directing the District to continue paying for Kevin's placement at Acadia during the pendency of the administrative hearing. Pursuant to this interim order, Kevin started classes at Acacia at the start of the 2000-01 school year.

On September 5, 2000, after a four-day hearing, the IHO issued a decision affirming the District's decision to graduate Kevin. The IHO found that the District met its burden of providing Kevin with a FAPE and that graduation was appropriate because Kevin had earned sufficient high school credits. Rejecting the parent's contention that Kevin's IEPs were inadequate, the IHO found that Kevin's IEP goals "were sufficiently quantifiable so that success could be gauged" and that any alleged deficiencies "did not materially compromise" Kevin's academic progress "which was considerable." The IHO further found that Kevin was provided with assistive technology as required by the IDEA and that the parents failed to request extended school year services for Kevin. Consequently, the IHO concluded that Kevin is not entitled to compensatory education and the District can properly issue him a high school diploma.

Thirty days after the IHO's decision, the District terminated its financial support of Kevin's placement at Acacia. Kevin, however, continued to attend Acacia at his parent's expense, and filed the instant action, pursuant to section 1415(i)(2) of the IDEA, appealing the IHO's decision. Plaintiffs seek the reversal of the IHO's decision and an order by this Court

requiring the District to provide Kevin with a free education until he turns twenty-one, one additional year of compensatory education, and to reimburse Kevin's parents for expenses incurred at Acacia after the District stopped funding Kevin's education.

Shortly after the filing of the initial complaint, Kevin and his parents filed a Motion for Statutory Injunction, pursuant to 20 U.S.C. 1415(j), seeking an order from this Court requiring the District to resume paying for Kevin's placement at Acacia. On March 30, 2001, this Court granted Kevin's Motion for Statutory Injunction and ordered the District to promptly take all necessary action to pay for Kevin's continued education at Acacia during the pendency of this action.

Subsequently, both parties have filed cross motions for summary judgment which are currently before the Court.

## STANDARD OF REVIEW

In reviewing a motion for summary judgment in an IDEA action, the Court does not apply the traditional summary judgment standard. Morton Community Unit Sch. Dist. No. 709 v. J.M., 152 F.3d 583, 587-88 (7th Cir.1998). The IDEA dictates that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate." 20 U.S.C. § 1415(i)(2). When neither party has requested the court to hear additional evidence, the "motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir.1997).

"The party challenging the outcome of the state administrative decision bears the burden of proof." Heather S., 125 F.3d at 1052. In reviewing the administrative record, the court "is required to give 'due weight' to the results of the administrative proceedings," id. at 1052-53, and may not "substitute [its] notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206 (1982). "[T]he 'due weight' which the court must give to the hearings below is not to the testimony of witnesses or to the evidence--both of which the court must independently evaluate--but to the decisions of the hearing officers." Heather S., 125 F.3d at 1053. "Due weight" implies "some sort of deference" to the agency's decision, and thus to the decisions of the hearing officers. Id. This deference results from Congress' recognition of the "specialized knowledge and experience" required to make complicated educational choices. Rowley, 458 U.S. at 207-08. Simply put, because the IHO "ha[s] much greater expertise in educational policy," the court should not "reverse the hearing officer's decision simply because [the court] disagrees with the decision." Bd. of Ed. of Arlington Heights Sch. Dist. No. 25 v. Illinois State Bd. of Educ., 2001 WL 585149, at *4 (N.D. Ill. March 19, 2001).

"Due weight," however, does not mean "abdication of all judicial function." Nein v. Greater Clark County Sch. Corp., 95 F. Supp. 2d 961, 965 (S.D. Ind. 2000) (quoting Patricia P. v. Bd. of Ed. of Oak Park, 203 F.3d 462, 466 (7th Cir. 2000)). The amount of deference given to the IHO's decision is based in part on whether the IHO's findings were "thorough and complete." See, e.g., Adams v. State of Oregon, 195 F.3d 1141, 1145 (9th Cir. 1999). The court, therefore,

is permitted to "take an independent and critical look at the evidence." Nein, 95 F. Supp. 2d at

965.

## ANALYSIS

Kevin contends that the District failed to provide Kevin a FAPE by: (I) violating IDEA

procedures; and (II) unilaterally graduating Kevin from high school. Based on these alleged

violations, Kevin contends that he is entitled to compensatory education. The Court will address

each of these contentions in turn.

### I.    Procedural Violations of the IDEA

The IDEA seeks to "assure that all children with disabilities have available to them . . . a

free appropriate public education ("FAPE"). . . ." 20 U.S.C. § 1400(c). To assure that disabled

children receive a FAPE, the IDEA requires that school districts cooperate with the parents in

creating an "individualized education program ("IEP")," which sets forth the child's educational

goals. 20 U.S.C. §§ 1401(11), 1414(d); Honig v. Doe, 484 U.S. 305, 311 (1988). To determine

whether the school district has provided a FAPE, courts must determine whether the school: (1)

complied with the IDEA's procedural requirements; and (2) developed an IEP that is "reasonably

calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206. See

also Heather S., 125 F.3d at 1054. "Once the school district has met these two requirements, the

courts cannot require more; the purpose of the IDEA is to 'open the door of public education' to

handicapped children, not to educate a handicapped child to her highest potential." Id. (quoting

Board of Educ. of Murphysboro Community Unit Sch. Dist. No. 186 v. Illinois State Bd. of

Educ., 41 F.3d 1162, 1166 (7th Cir.1994)).

Under <u>Rowley</u>, the district court must not only ensure that the school district has adopted "the plan, policies, and assurances required by the Act, but also [] determine that the [district] has created an IEP for the child in question which conforms with the [statutory] requirements." <u>Rowley</u>, 458 U.S. at 206-07 n.27.  However, while the procedural requirements of the IDEA have great importance, Congress implemented them to achieve "full participation of concerned parties throughout the development of the IEP." <u>Id.</u> at 206.  Therefore, where the parents fully participate in the plan to develop the IEP, the first prong of <u>Rowley</u> is usually met.  <u>See Doe v. Defendant I</u>, 898 F.2d 1186, 1191 (6th Cir.1990); <u>Doe v. Alabama State Dept. of Educ.</u>, 915 F.2d 651, 663 (11th Cir.1990).

Here, Kevin contends that the District failed to provide Kevin a FAPE by: (A) drafting Kevin's IEPs with vague and unmeasurable goals and objectives and not amending the IEPs to meet his unique needs; (B) failing to consider Kevin for assistive technology ("AT"); (C) not permitting Kevin to participate in state-wide assessment tests; (D) failing to properly implement a transition plan; and (E) not offering Kevin extended school year services ("ESYS").

Unfortunately, in its decision below, the IHO did not fully explain whether the District violated the IDEA's procedures.  Instead, the IHO made a conclusory finding that the alleged procedural violations, "if they were violations, could have been dealt with at the time or through due process proceedings."[3]  Therefore, because the IHO found that Kevin's parents were able to

---

[3]    In making this finding, the IHO appeared to hold that because the parents did not point out the alleged procedural defects at the time of the IEP conferences that the parents and not the school are responsible for the procedural defects.  This conclusion flies in the face of the law which holds that "a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) . . . . [r]ather it is the responsibility of [the school] to ascertain the child's educational needs, respond to deficiencies, and place [the child] accordingly." <u>M.C. v. Cent. Reg'l Sch. Dist.</u>, 81

fully participate in Kevin's education, the IHO concluded that the alleged procedural violations did not violate Kevin's right to a FAPE.

While parental participation is one of the key components in assessing procedural violations, see Rowley, 458 U.S. at 206, the fact that the parents had adequate notice and were able to participate in the proceedings does not end the inquiry. In addition, the fact finder must determine whether the alleged procedural violations deprived the student of an IEP or resulted "in the loss of educational opportunity." Knable v. Bexley City Sch. Dist., 238 F.3d 755, 766 (6th Cir. 2000). See also Bd. of Educ. of Oak Park & River Forest High Sch. Dist. No. 200, 21 F. Supp. 2d at 874 ("procedural inadequacies that result in the loss of educational opportunity . . . clearly result in the denial of a [FAPE]"). Consequently, because the IHO did not make a finding of whether the alleged procedural violations resulted in a "loss of educational opportunity" for Kevin, this Court will independently address each of the above alleged procedural violations to determine if they, in fact, occurred and whether they resulted in a loss of an educational opportunity.

### A.     Kevin's IEP

The IDEA requires that school districts include the following information in the IEPs: (1) "a statement of the child's present levels of educational performance, including how the child's disability affects the child's involvement and progress in the general curriculum," section 1414(d)(1)(A); (2) annual goals and short-term objectives for improvements, id.; (3) "a description of the specifically designed instruction and services that will enable the child to meet

---

F.3d 389, 397 (3d Cir. 1996). Moreover, after reviewing the evidence, including many letters to the District from Kevin's parents, this Court finds that Kevin's parents did an excellent job in attempting to have Kevin educated to the fullest extent possible under the IDEA.

those objectives," Honig, 484 U.S. at 311; and (4) a statement of "[h]ow the child's progress toward the annual goals . . . will be measured." 34 C.F.R. § 300.347. In determining how the child's progress should be measured, the Tenth Circuit in Helms, 750 F.2d at 825, noted that the predecessor to the IDEA, the Education for All Handicapped Children Act, "clearly contemplates that a handicapped child's progress in school should be measured by objective, if not standardized, standards." Additionally, section 1414(d)(4)(A) requires that the school review the IEP at least annually "to determine whether the annual goals for the child are being achieved" and revise the IEP to address "any lack of expected progress toward the annual goals" and "the child's anticipated needs." See also 34 C.R.F. § 300.346(b).

Plaintiffs contend that Kevin's IEPs violate the procedural requirements of the IDEA because they contained vague and unmeasurable goals and objectives and were not amended to address his academic difficulties. Although characterized as a procedural violation by Plaintiffs, other courts when analyzing similar alleged defects in IEPs, have analyzed such defects under the substantive analysis of the second prong of the Rowley test. See Knable, 238 F.3d at 767-769; Nein, 95 F. Supp. 2d at 971; TH, 55 F. Supp. 2d 830. Consequently, this Court will analyze the alleged deficiencies in Kevin's IEPs under the Rowley substantive analysis.

As discussed above, Rowley mandates that IEPs must be "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206. The Rowley court specifically declined to set out a bright-line rule for what satisfies a FAPE in part because the court noted that children have different abilities and are therefore capable of different

achievements.[4] Id. at 202.  Therefore, the court adopted an approach which would take into account the potential of the disabled student but noted that the school need not "maximize each handicapped child's potential."  Id. at 199.  To satisfy the Rowley reasonableness standard, however, the school must offer more than "mere token gestures or a trifle," Nein, 95 F. Supp. at 973 (citations omitted), and where the student "display[s] considerable intellectual potential, [the] IDEA requires a great deal more than a negligible [benefit]."  Ridgewood Bd. of Ed. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999).  See also Hall v. Vance County Bd. of Ed., 774 F.2d 629, 636 (4th Cir. 1985) ("Rowley recognized that a FAPE must be tailored to the individual child's capabilities and that while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children").  Therefore, in determining whether a school district has provided a FAPE, the court must analyze the child's intellectual potential and then assess the student's academic progress.  See Ridgewood Bd. of Ed., 172 F.3d at 247 (reversing the trial court, for failing to analyze the student's academic potential).

Following the above standards, when analyzing whether an IEP is reasonably calculated to provide "educational benefits,"courts examine the child's intellectual potential and disability and the academic progress the child has made under the IEP.  For example, in Nein, 95 F. Supp. 2d at 971, the parents of a disabled student challenged the administrative appeal board's decision that the school district had provided a FAPE.  Relying on the student's scores on academic achievement and intelligence tests, the parents contended that the school violated the substantive

---

[4]     In accordance with Rowley, the regulations governing the IDEA require that IEPs should be based on "the child's unique needs and not on the child's disability."  34 C.F.R. § 300.300(a)(3)(ii).

standards of the IDEA by failing to provide the student with the minimum required educational benefit. Id. at 971-72. The school district argued that it supplied the student with "some educational benefit" as demonstrated by the student's progress in a special education reading course, his grade level promotion, and "good academic grades." Id. at 972.

Rejecting the school's argument, the court held that "[i]f an IEP must be designed to take into account a child's individual educational needs, it logically follows that the child's capacity to learn should also be considered in evaluating the IEP." Id. at 974. The court found that the child was of "average intelligence" and before entering the school district had an IQ of 95. Id. at 963. After three years at the school district, however, the student's IQ dropped "an astonishing 20 points" to 75. Id. Despite this significant drop, the school did not make or plan on making any changes to the student's IEP to address his academic difficulties. Id. at 975. Based on these findings, the court held that "where a child with a severe learning disability but significant potential ma[kes] no transferable progress in three years, and where there was no indication the public school was ready and able to change direction, the limits of 'due weight' and judicial deference to school authorities have been exceeded." Id. Consequently, although required to give "due deference" to the hearing officer, the court held that the student's grade level promotions were not sufficient evidence that the IEP was "reasonably calculated to confer [an] educational benefit upon" the student, and that the regression of the student's IQ showed that the school district had failed to provide the student with a FAPE. Id. at 975, 977-78.

Similarly, in Board of Education of Oak Park & River Forest High School District No. 200, 21 F. Supp. at 877, in affirming the hearing officer's decision that the district failed to provide a FAPE, the court found that the student's poor academic record indicated that the

educational benefit she was receiving was "minimal." The student failed half her classes, and "except for passing several pass/fail classes and making one B [in a reading class], received Ds in the remaining half." Id. The court agreed with the hearing officer's finding that the district failed to institute a "systematic and comprehensive plan to deal with [the student's] reading difficulties," and that "[s]uch a failure was manifested . . . by the absence of any goals or objectives that specifically addressed these reading, deficits." Id.

Likewise, in Helms, 750 F.2d at 821-22, a disabled student brought suit under the Education for All Handicapped Children Act ("EAHCA"), the predecessor to the IDEA, after the state administrative review board ordered the student, who had received 12 years of education, to be graduated from high school. The school district contended that the student was not entitled to further education because she had already received 12 years of free education under the EAHCA and was therefore eligible to graduate. Id. at 824. Rejecting this argument and affirming the district court's decision in favor of the student, the Tenth Circuit held that under the EAHCA, a disabled student's progress "from grade to grade is to be measured by reference to his or her IEP rather than the standardized curriculum." Id. Moreover, the IEP should measure the student's progress "by objective, if not standardized, standards." Id. Therefore, the district court must examine the student's IEPs to ensure that IEP objectives are being met and that the student is not just advancing from grade to grade. Id. at 825.

Applying these standards to the student's IEP, the court found that it appeared to conform to the statutory requirements because it listed the child's "strengths and weaknesses and current achievement levels." Id. The IEP also listed seven "instructional objectives" with a description of when and how the objectives would be completed. Id. Next to each objective, the IEP had

nine columns with "numbers 10 through 90 in increments of 10 for the indication of the date on which the percentage of the objective is mastered." Id. The columns listing the student's progress, however, were completely blank. Id. Consequently, the court found that "no attention whatsoever had been paid to the extent to which [the student] was accomplishing her objectives," and therefore, the court held that the school had violated the EAHCA because it failed to measure the student's "success or failure by her ability to master specific objectives." Id.

Similarly, in Hall, 774 F.2d at 635, the Fourth Circuit affirmed the district court's finding that the school district had failed to provide a disabled student with an "education reasonably calculated to enable him to receive educational benefits." In reaching this decision, the court noted that the lower court properly rejected the school district's contention that the student's "academic progress, as measured by his grade promotions . . . evidences educational benefit" under Rowley. Id. Instead, the court held that independent evaluations and standardized test scores demonstrated that the child did not receive educational benefits as required by the IDEA and Rowley. The student was of above average intelligence, but his test scores indicated that he made little improvement in his reading ability over several years, despite the implementation of an IEP supposedly designed to address his disability and problems with reading. Id.

With these standards in mind, the Court now turns to the analysis of Kevin's IEPs. Plaintiffs contend that Kevin's IEPs violate the procedural requirements of the IDEA because the IEPs contained vague and unmeasurable goals and objectives and were not amended to meet his unique needs. To determine if Kevin's IEPs met the standards under the IDEA, the central question before the Court is whether Kevin's IEPs were reasonably calculated to confer sufficient educational benefits upon Kevin. As explained above, to make this determination, the Court

-14-

must assess Kevin's intellectual potential, given his disability, and then determine the academic progress Kevin made under the IEPs designed and implemented by the District.

Kathy Fouks, the principal at Acacia, who has over 29 years of experience in working with special education students and a masters degree in special education reading, testified that based on her experience with Kevin and on his IQ scores that Kevin is of "average" intelligence and possesses the cognitive ability to improve his academic skills from where they currently stand.

Despite his average intellectual potential, Kevin's IQ and academic achievement scores significantly decreased from 1990 to when he entered Acacia.[5] In 1990 Kevin had a full scale IQ of 101. Three years later in 1993, however, Kevin's IQ had dropped to 87 and fell another four points in 1999 to 83. Ms. Fouks testified that such a drastic departure in IQ scores is generally the result of a deterioration in academic skills or that the student's academic functioning has not increased as the student has progressed in age.

Ms. Fouks's opinion is buttressed by the fact that Kevin's scores in academic achievement tests decreased significantly from 1993 to 1999. After completing a year at Acacia, however, Kevin's scores improved. In 1993, Kevin tested at the following levels: (1) reading at the seventh grade level; (2) math between the fifth and sixth grade level; and (3) writing skills at the low end of the third grade level. The District assessed Kevin's academic skills again in 1996

---

[5] The District contends that all events prior to 1998 are irrelevant because they fall outside the IDEA's two year statute of limitations. While the Court acknowledges that the District cannot be held accountable for action before 1999, as discussed above, Kevin's IQ and academic test scores and his IEPs before 1998 are relevant to the Court's determination of whether Kevin's IEP's were "reasonably calculated to enable [Kevin] to receive educational benefits." Therefore, the Court will examine evidence from before 1998.

and his reading and spelling measured at the seventh grade level and math at the third grade level without a calculator and eighth with a calculator. Upon entering Acacia at the beginning of the 1999 school year, Kevin's academic skills were measured as follows: (1) reading between the third and fourth grade level; (2) math between the fourth and fifth grade level; and (3) writing skills between the third and fourth grade level. After a successful and productive 1999-2000 school year at Acacia, Kevin tested at the following levels: (1) reading between the sixth and seventh grade level; (2) math between the seventh and eighth grade level; and (3) writing skills between the sixth and seventh grade level.

Reviewing his current level of academic performance, Ms. Fouks testified that although Kevin has improved in math, he still has significant problems with basic multiplication and division and needs additional instruction. She also stated that although Kevin reads between the sixth and seventh grade level, this level of performance is based mainly on the fact that as a 19 year old, Kevin has a lot of words memorized. When it comes to words that Kevin has not memorized, however, Kevin has a very difficult time determining the meaning of words based on their context in a sentence. Ms. Fouks also testified that Kevin has "severe writing problems" in that he has great difficulty properly using correct punctuation, capitalization, and grammar.

The decrease in Kevin's IQ and academic scores is further demonstrated by his grades. For the 1998-99 school year, after previously attending schools for special education students, the District enrolled Kevin at York for his senior year. Unfortunately, however, Kevin's lack of academic progress caught-up with him at York where he received D's in his first semester academic classes and F's in the second semester.

Ms. Fouks' testimony is further bolstered by the testimony of Debra Homa, a vocational coordinator with 23 years experience working with learning disabled students. Ms. Homa evaluated Kevin in October 1998 and found that he had "limited math skills" (third grade level) without a calculator and that his reading ability was at the sixth grade level. She also found that Kevin had a very difficult time with reading comprehension and had a limited vocabulary. When asked about the tests that she administered to Kevin, Ms. Homa stated that she believed the tests were a "good indicator" of Kevin's abilities at that time. Ms. Homa presented her findings and six recommendations to the District at the October 1998 IEP conference. Ms. Homa stated that the District was surprised about Kevin's low reading scores but not by his poor math abilities.

To rebut Ms. Fouks's testimony, the District presented Linda Johnson, the school psychologist at York. Ms. Johnson testified that the decrease in Kevin's IQ scores was not the result of a lack of intellectual achievement under the IEPs. Rather, there could be a "variety of reasons"and that she did not "think that anybody would be able to say precisely why that would have occurred." However, she later testified that while there was a decline in the actual scores, looking at all the tests as being within a range of scores, Kevin's scores did not actually decrease at all. The drop in Kevin's IQ scores, according to Ms. Johnson, can be explained by the "statistical structure" of the tests and Kevin's own mental state on the test days. When asked to explain the "statistical structure," Ms. Johnson stated that the test scores reflect a "range" or "confidence level" of ten points. For example, a score of 100 reflects a score in the range of 110 to 90, and therefore, a subsequent score of a 95 would be considered within the "range" and not a decreased score.

In regards to Kevin's decreased scores on reading tests, Ms. Johnson stated that a sixth grade reading level was appropriate for Kevin given his limited intellectual capacity. However, she also testified that Kevin's reading difficulties were not the result of a cognitive disability but rather resulted from Kevin's ADHD. When asked what goals and objectives were crafted for the IEPs to address her concerns about ADHD interfering with Kevin's reading, Ms. Johnson, after reviewing the IEPs, testified that reading was not identified as an area of concern. Despite her testimony laying the blame for Kevin's reading problems on his ADHD, Ms. Johnson testified that by 1999 Kevin no longer had ADHD. Moreover, Ms. Johnson stated that based on Kevin's grades that he was making sufficient academic progress. However, despite the above testimony, Ms. Johnson, after reviewing Kevin's 1998 test scores, agreed that the was a "severe discrepancy" between Kevin's grade level/age and his reading ability which was measured at the 4.6 grade level in 1998.

In contrast to Ms. Johnson's testimony, the District's own witness, Pam Dreyer, a special education teacher and Kevin's case manager, testified that Kevin's reading scores were "much lower" than his ability and that the text books used in some of Kevin's classes, for which he received Ds and Fs, were for students reading at the third/fourth grade level.

Carefully reviewing the above evidence, this Court finds that Kevin possesses average intellectual potential and that from 1990 to 1999, Kevin's academic skills stayed constant or decreased. In making this determination, the Court finds the testimony of Ms. Fouks, Ms. Homa, and Ms. Dreyer to be much more credible than the testimony of Ms. Johnson. Ms. Johnson, who is a psychologist and not an expert in special education, gave evasive and inconsistent answers regarding Kevin's intellectual ability and the reasons for his decrease in IQ and academic test

scores. Moreover, her opinion that the decrease in Kevin's IQ scores can be explained by the "statistical structure" does not account for why or how his IQ score dropped by almost 20 points over nine years.

Next, in order to determine whether Kevin's IEPs were reasonably calculated to confer sufficient educational benefits upon Kevin, the Court must assess Kevin's IEPs. In particular, the Court will examine if the District failed to amend Kevin's IEPs to meet his specific academic needs and difficulties.

Carefully reviewing Kevin's 1998, 1999, and 2000 IEPs, this Court finds that each IEP contains almost identical goals, objectives, and present levels of performance. As explained above, the District was required to review and revise Kevin's IEPs at least annually to determine if the current IEP goals and objectives are sufficient to confer an educational benefit upon Kevin. See 20 U.S.C. § 1414(d)(4)(A); 34 C.F.R. § 300.346(b); Nien, 95 F. Supp. 2d at 975.

Ms. Fouks testified that she attended two IEP conferences. For the October 1999 and February 2000 meetings, Ms. Fouks presented the IEP team with a list of what she believed were Kevin's strengths and weaknesses. Of particular concern to Ms. Fouks was Kevin's auditory ability. According to Ms. Fouks, Kevin had an extremely difficult time processing auditory information. Kevin also had difficultly with reading comprehension and math calculation.

Ms. Fouks presented these concerns to the IEP team and at the February 2000 meeting presented draft goals and objectives. The District, however, did not "feel [Kevin] had a reading problem, word recognition or comprehension problem" and did not adopt any of Ms. Fouks's goals and objectives as part of Kevin's IEPs. In regards to Kevin's difficulties in math, Ms. Fouks testified that math was not even discussed at the October 1999 meeting and that until

-19-

February 2000, the District did not even include a math objective in the IEP. Despite hearing Ms. Fouks's concerns, the District did not make any changes to the goals and objectives of Kevin's IEP. Instead, Ms. Fouks testified that the District was mainly concerned with whether Kevin was taking the proper classes so that he had enough credits to graduate in June 2000.

Ms. Fouks's testimony is consistent with other witnesses who testified that the District failed to review and revise Kevin's IEPs even though the District was aware of Kevin's academic difficulties. For example, Ms. Dreyer who testified that, despite being aware of Kevin's poor reading scores, the District did not make any changes to Kevin's goals and objectives in his IEP to address his reading difficulties. Similarly, Ms. Homa presented her findings of Kevin's academic problems and six recommendations to the District at the October 1998 IEP conference. Ms. Homa stated that the District was surprised about Kevin's low reading scores but not by his poor math abilities. However, the District did not take any actions to adjust Kevin's IEPs to account for these difficulties. Furthermore, Ms. Mayers testified that she presented her assessment of Kevin's poor reading scores to the District, but the District did not make any changes to Kevin's IEPs. Finally, although receiving all Ds in his classes his first semester at York, the District did not adjust Kevin's IEP to account for his poor academic performance.

Despite the above evidence of Kevin's academic potential and his regression of skills from 1990 to 1999, the IHO found that Kevin's IEP goals "were sufficiently quantifiable so that success could be gauged" and that any alleged deficiencies "did not materially compromise" Kevin's academic progress "which was considerable." Although required to give "due deference" to the IHO, after an extensive review of the administrative record, this Court finds that Kevin's IEPs were not "reasonably calculated to confer [an] educational benefit upon"

-20-

Kevin. Like the student in <u>Nien,</u> F. Supp. 2d at 971, Kevin possessed average intellectual

potential but his IQ and academic achievement scores dramatically decreased from 1990 to 1999.

Despite knowing of this decrease and of Kevin's poor grades at York, the District failed to

review or revise Kevin's IEPs to address his increasing academic difficulties. Accordingly, this

Court finds that the District failed to provide to provide Kevin with a FAPE and thus reverses

IHO's decision that Kevin made sufficient progress under his IEPs to provide him with an

educational benefit.[6]

## B.    Other Alleged Procedural Violations

In addition, Kevin and his parents allege that the District violated IDEA procedures by:

(1) failing to assess Kevin for AT needs; (2) not permitting Kevin to participate in state-wide

academic assessment tests; (3) failing to properly make transition plans; and (4) not offering

Kevin ESYS. Because this Court must determine whether the alleged procedural violations

resulted "in the loss of educational opportunity," <u>Knable,</u> 238 F.3d at 766; <u>Bd. of Educ. of Oak</u>

<u>Park & River Forest High Sch. Dist. No. 200,</u> 21 F. Supp. 2d at 874, the Court will examine the

alleged procedural errors together to see if they resulted in the loss of an education opportunity

for Kevin.

---

[6]    The Court further notes that after a four-day hearing and an administrative record
of 1791 pages, the IHO's "findings of fact" and "conclusions of law" were only four pages and
contained numerous conclusory findings which do not have basis in the factual record, and
therefore, this Court need not give as much deference to the IHO's decision as it would typically
give that of an administrative judge in an IDEA action. <u>See, e.g., Adams,</u> 195 F.3d at 1145 (the
amount of deference given to the IHO's decision is based in part on whether the IHO's findings
were "thorough and complete").

### 1. Assistive Technology

When drafting a student's IEP, the school district "shall . . . consider whether the child requires assistive technology devices and services." 20 U.S.C. § 1414(d). AT devices includes "any item, piece of equipment, or product system, whether acquired commercially off the self, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability." 34 C.F.R. § 300.5. AT "services" include evaluation of the AT needs of the child, obtaining, designing, and selecting appropriate AT devices, training personnel to provide AT services. 34 C.F.R. § 300.6.

Here, several witnesses testified that Kevin should have been assessed for and given AT to assist him in overcoming his poor academic performance. For, example, Ms. Fouks testified that Kevin's inability to process auditory information was one of the main causes of his failure to make academic progress. To overcome this problem, Ms. Fouks believed that Kevin needed "as much visual input as possible," which could have been provided by AT. Therefore, Ms. Fouks believed that Kevin could have "definitely" benefitted from AT. Ms. Fouks, however, testified that AT was not even discussed at the October 1999 IEP meeting. Similarly, in her vocational recommendation, Ms. Homa noted that Kevin could benefit from the use of vocabulary building software.

Despite the IDEA's requirement that the District "shall consider" AT and Ms Fouks's and Ms. Homa's opinions that Kevin needed AT, the District did not "consider" let alone provide Kevin with AT. Ms. Johnson testified that AT was discussed at IEP meetings but "it wasn't discussed in any detail." Ms. Dreyer, Kevin's case manager, was not even familiar with what constituted AT. Furthermore, Ms. Swetin testified that Kevin was never assessed for AT.

Consequently, after reviewing Kevin's IEPs and the above testimony, this Court finds that the District failed to consider or provide Kevin for AT in violation of the IDEA.

### 2.    State Achievement Tests

IEPs must include a statement of any modifications which are required for the child to take state wide assessment tests. 34 C.F.R. § 300.347(a)(5). If the school district determines that the child will not participate in "a particular State or district-wide assessment of student achievement," the IEP must include a statement of why the assessment is not appropriate for the child and "[h]ow the child will be assessed." Id.

Here, Bob Zenillo, director of pupil services, testified that 97-98% of the District's special education students take the IGAP state assessment test. However, despite this testimony, Kevin's IEPs after 1994 either state that IGAP testing is not appropriate for Kevin, without explanation as to why this is the case, or are silent on the issue of state assessment tests. Accordingly, this Court finds that the District has failed to follow section 300.347(a)(5).

### 3.    Transition Services

To ensure that disabled students can adequately function in society after graduation, the IDEA mandates that "beginning at the age of 14," and every year thereafter, the student's IEP must contain "a statement of the transition service needs of the child." 20 U.S.C. § 1414(d)(1)(A)(vii). Once the child turns the age of 16, the IEP must contain "a statement of needed transition services for the child." Id. See also 34 C.F.R. § 300.347(b). The term "transition services" means "a coordinated set of activities for a student with a disability that":

> (A) is designed within an outcome-oriented process, which promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

(B) is based upon the individual student's needs, taking into account the student's preferences and interests; and

(C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(30).

Here, a review of Kevin's IEPs indicate that the first transition plan for Kevin was implemented in November of 1998, when Kevin was seventeen years old. The District did provide Kevin with vocational services to help Kevin secure employment after graduation. Kevin, however, expressed an interest in attending junior college at the College of DuPage ("COD"). The District, however, did not amend his IEP transition plan to reflect Kevin's desire to attend COD because the District believed, despite his limited academic skills, that he could succeed at the COD. Ms. Fouks and Ms. Homa, in contrast, testified that they did not believe that Kevin had the necessary skills to attend COD without staying in high school to improve his basic academic skills.

Reviewing the above evidence, this Court finds that the District failed to follow the IDEA by waiting until Kevin was 17 years old to draft a transition plan and that the transition plans the District did draft failed to provide for Kevin's preference to attend COD which, given his limited academic skills, would have been very unlikely.

### 4. Extended School Year Services

The regulations implementing the IDEA require school districts to ensure that ESYS "are available as necessary to provide FAPE." 34 C.R.F. § 300.309(a)(1). Every disabled student, however, is not entitled to ESYS. Reusch v. Fountain, 872 F. Supp. 1421, 1427 (D. Md. 1994). Schools are only required to provide ESYS if the child will suffer significant regression of skills

without ESYS, "so as to seriously affect [the student's] progress towards self-sufficiency." Cordrey v. R.J. Euckert, 917 F.2d 1460, 1470 (6th Cir. 1990). To show that the student will suffer significant regression, the student must show empirical evidence that regression occurred in the past or put on expert evidence that such regression will occur without ESYS. Id. at 1471-72.

Here, the record reveals that the District did discuss the possibility of ESYS for Kevin but that the District believed that Kevin would not suffer significant regression of skills. Because Kevin and his parents have not set forth any evidence regarding regression of academic skills over the summer months, this Court finds that the District did not violate the IDEA with regard to ESYS.

In sum, this Court finds that the District violated IDEA procedures by: (1) failing to consider or provide AT; (2) not permitting Kevin to participate in state academic assessment tests; and (3) failing to properly implement transition plans. Given Kevin's academic problems, as discussed above, this Court finds that these procedural violations resulted "in the loss of educational opportunit[ies]" for Kevin, and therefore, deprived him of a FAPE. See Knable, 238 F.3d at 766; Bd. of Educ. of Oak Park & River Forest High Sch. Dist. No. 200, 21 F. Supp. 2d at 874. This Court accordingly reverses the IHO's decision that the District provided Kevin with a FAPE.

## II.    The District's Decision to Graduate Kevin

The District contends that because Kevin "can graduate" with a regular high school diploma, the District no longer has an obligation to provide Kevin with a FAPE. The federal regulations implementing the IDEA require that school districts provide a FAPE to children with

qualifying disabilities until the age of twenty-one. 34 C.F.R. § 300.121. This obligation, however, does not apply where the disabled student has "graduated from high school with a regular high school diploma." 34 C.F.R. § 300.122.

To graduate a student with a disability under the IDEA, the student must meet the general graduation requirements and make progress on or complete the IEP goals and objectives. Chuhran v. Walled Lake Consol. Sch., 839 F. Supp. 465, 474 (E.D. Mich. 1993), aff'd, 51 F.3d 271 (6th Cir. 1995). Automatic grade promotion does not necessarily mean that the disabled child received a FAPE or is required to be graduated. See, e.g., Rowley, 458 U.S. 203, n.25.

Here, after a careful review of the record, this Court finds that the District's decision to graduate Kevin was based on his accumulation of required credits and not based on his progress on his IEP goals and objectives. Ms. Fouks testified that she could not recall whether the District discussed Kevin's IEP goals and objectives when making the determination to graduate Kevin. Instead, the District focused on whether Kevin was passing his courses so that he would have sufficient credits to graduate. Likewise, Ms. Johnson and Mr. Patterson, both of whom were called by the District, testified that in making the determination to graduate Kevin, the IEP team reviewed his grades, credit hours, and transition plan but not Kevin's IEP goals and objectives. Similarly, Kevin's father testified that the District's decision to graduate Kevin was based solely on Kevin's grades and credit hours and not on whether Kevin had made progress on his IEP goals and objectives. Moreover, Kevin's February 2000 IEP states that the District recommends that Kevin graduate in June 2000 because he "will have completed all the required credits for graduation . . . by the end of the current semester." Mr. Zenillo was the only witness who testified that the District considered Kevin's progress on his IEP goals and objectives in deciding

to graduate Kevin. However, he could not specifically recall how the District assessed Kevin's progress in making this determination. Carefully reviewing the above evidence, this Court finds that the District did not assess whether Kevin made any progress on or completed his IEP goals and objectives, and thus, inappropriately graduated Kevin. Therefore, this Court reverses the IHO's decision affirming the District's decision to unilaterally graduate Kevin.

Additionally, because the District inappropriately graduated Kevin, this Court orders that the District reimburse Kevin's parents for the reasonable expenses incurred at Acacia after the District stopped its funding of Kevin's education and before this Court entered its stay put order. See Nein, 95 F. Supp. 2d at 980-81 (award reimbursement to parents who unilaterally placed child in school where district failed to provide child a FAPE).

### III.    Compensatory Education

Compensatory education is "a legal term used to describe future educational services" which courts award to a disabled student under the IDEA "for the school district's failure to provide a [FAPE] in the past." Brett v. Goshen Com. Sch. Corp., 161 F. Supp. 2d 930, 942 (N.D. Ind. 2001). Although the IDEA only requires that school districts provide a FAPE until the student reaches the age of 21, if the district has failed to provide a FAPE, the court may award the student free educational assistance after the age of 21 to cure the school district's past failure to provide the student with a FAPE. Bd. of Educ. v. Illinois State Bd. Educ., 79 F.3d 654, 656 (7th Cir. 1996). Therefore, this Court may award compensatory education to Kevin past his 21st birthday to cure the District's past denial of a FAPE.

Here, as discussed above, the District did not provide Kevin a FAPE. Therefore, to cure this violation, the Court orders that the District continue to pay for Kevin's education at Acacia until he reaches the age of 22.

## CONCLUSION

For the foregoing reasons, this Court GRANTS Plaintiffs Kevin T., W.T. and K.T.'s Motion for Summary Judgment [22-1] and DENIES Defendant Elmhurst Community School District No. 205's Motion for Summary Judgment [31-1]. Therefore, this Court reverses the decision of the Independent Hearing Officer and an orders that the District: (1) provide Kevin with a free education until he turns twenty-one and one additional year of compensatory education; and (2) reimburse Kevin's parents for expenses incurred at Acacia after the District stopped its funding of Kevin's education before this Court's entered its stay put order. The Court, having disposed of the litigants' claims, directs the clerk of the court to enter a Rule 58 judgment and to terminate this case from the court's docket. It is so ordered.

ENTER

_Blanche M. Manning_
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE: _3-19-02_